**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1221

IBRAHIMA DIENG,

Plaintiff - Appellant,

v.

ORKIN, LLC,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Lydia Kay Griggsby, District Judge. (8:21-cv-00482-LKG)

Argued: December 11, 2025                    Decided: August 5, 2026

Before GREGORY, QUATTLEBAUM, and BERNER, Circuit Judges.

Vacated and remanded in part and affirmed in part by published opinion. Judge Berner wrote the opinion, in which Judge Gregory joined. Judge Quattlebaum wrote a separate opinion concurring in part, concurring in judgment in part, and dissenting in part.

**ARGUED:** Richard Allen Salzman, HELLER, HURON, CHERTKOF & SALZMAN, PLLC, Silver Spring, Maryland, for Appellant. Charles Joseph Kresslein, JACKSON LEWIS PC, Baltimore, Maryland, for Appellee. **ON BRIEF:** Sharon T. Rogart, HELLER, HURON, CHERTKOF & SALZMAN, PLLC, Silver Spring, Maryland, for Appellant.

BERNER, Circuit Judge:

Over sixty-one million people in the United States contend with physical or mental disabilities that impact their lives, including their ability to engage in gainful employment.[1] Far too often, discrimination and prejudice place barriers in front of individuals with disabilities, impeding them from competing on an equal basis and pursuing opportunities that should be available to all members of our society. Through passage of the Americans with Disabilities Act (ADA), Congress sought to eradicate these invidious barriers that long relegated individuals with disabilities to the margins of economic and civil life. Within the employment context, the ADA not only prohibits discrimination based on disability, but absent undue hardship, specifically requires employers to provide workplace adjustments—known as "reasonable accommodations"—to allow workers with disabilities the same workplace opportunities as those without disabilities.

Ibrahima Dieng worked at Orkin as a pest control technician for many years. After suffering a workplace injury, Dieng went on leave. Upon his recovery, Dieng informed Orkin that he was ready to return to work. He could no longer work as a pest control technician, however, because of a disability that resulted from his workplace injury. He repeatedly asked to be reassigned to a less physically demanding position. Such positions are known as "light-duty positions."

---

[1] Centers for Disease Control & Prevention, *Prevalence of Disabilities and Health Care Access by Disability Status and Type Among Adults*, (Apr. 11, 2025), https://www.cdc.gov/disability-and-health/articles-documents/disabilities-health-care-access.html [https://perma.cc/R7FF-KHZU].

Orkin ignored Dieng's requests for reassignment and did not reach out to him to discuss light-duty positions. All the while, Dieng remained on unpaid leave. After sixteen months, he submitted his resignation.

Dieng sued Orkin under the ADA, alleging that Orkin failed to reasonably accommodate his disability and unlawfully terminated him on the basis of his disability. The district court granted summary judgment to Orkin on both claims. On appeal, Dieng argues summary judgment was inappropriate because a reasonable jury could conclude that Orkin failed to meet its legal obligation to provide him with a reasonable accommodation. We agree. While Dieng was no longer able to work as a pest control technician because of his disability, genuine disputes of material fact remain as to whether Orkin was obligated to reassign him to a light-duty position. On Dieng's claim of unlawful disability discrimination, we agree with the district court that summary judgment was appropriate. Dieng failed to exhaust his administrative remedies on this second claim before filing his lawsuit, and thus it was properly dismissed.

Accordingly, we vacate in part and affirm in part the district court's grant of summary judgment and remand for further proceedings.

## I.      Factual Background

We recount the facts from the record in the light most favorable to Dieng, the nonmovant, as is required upon review of a district court's grant of summary judgment. *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 254 (4th Cir. 2025).

A.  Dieng's Employment at Orkin

Ibrahima Dieng worked as a pest control technician for Orkin, LLC (Orkin) in Gaithersburg, Maryland. In this role, Dieng drove to customers' locations to inspect for pests and, when necessary, to treat the premises with pesticides. The pest control technician position is physically demanding and requires technicians to, among other tasks, kneel, climb, crawl, and lift heavy equipment often exceeding fifty pounds. As part of his work, Dieng sold pest control services to customers and was eligible to earn commissions from those sales. By all accounts, Dieng performed well in his position. Supervisors attested to Dieng's skills and abilities and his strong customer relationships.

Dieng suffered three different workplace injuries during his time at Orkin, for which he submitted claims for workers' compensation. The last injury, which occurred in February 2016, led to the disabling condition which is at the heart of this case. While servicing a building, Dieng slipped and injured his right knee cap. He went out on leave from his work.

Following a period of rehabilitation, in July 2016, Dieng's doctor advised him that, though he would be unable to return to work as a pest control technician, he was cleared to return to work in a less physically demanding position. Specifically, Dieng's treating physician determined that Dieng would be able to lift up to twenty pounds and directed

4

him to avoid "repetitive stopping, bending, twisting, prolonged sitting or standing." Parties' Joint Appendix (J.A) 916. Dieng submitted copies of his physician's notes to Orkin.

Eager to return to work, on August 18, 2016, Dieng sent a text message to his Orkin branch manager, Blake Hunter. Dieng wrote that he had been cleared by his treating physician to return to work in a light-duty position. Recalling that Hunter had once told him that no light-duty positions were available, Dieng asked him whether anything had changed. Hunter never responded to Dieng's text message.

Four days after he sent this text message, Dieng emailed Hunter to inquire whether he had received the text. Dieng told Hunter that he had called Orkin's main office and was informed that Hunter was unavailable. This time, Hunter wrote back, but he said nothing about Dieng's injury, his request to return to work, or his need for a light-duty assignment. Hunter simply replied that he would ask someone from Orkin's "[r]isk department" to contact Dieng. J.A. 912.

In his deposition, Hunter testified that he could not recall whether he had ever, in fact, contacted Orkin's "risk department," nor could he remember whether he ever followed up with Dieng after their email exchange. While Hunter testified that he spoke with a representative of Orkin's human resources department about Dieng's request, he acknowledged that he never received a response and that he never followed up. No one from Orkin ever reached out to Dieng to discuss his physical limitations, the type of light-duty work he might be able to perform, or whether such positions were available.

In late August 2016, Dieng underwent a functional capacity evaluation with a physician to determine the extent of his physical capabilities and limitations following his

5

workplace injury. The report from this evaluation, which was provided to Orkin, concluded that Dieng would be able to hold a position with light to medium physical demands.

In early October 2016, Dieng's counsel sent Orkin a letter notifying the company that Dieng, who was still on unpaid leave, was "eager to return to gainful employment" and asking to be advised "in writing when light duty bec[a]me[] available." J.A. 41. The following week, Dieng's counsel again informed Orkin, this time by email, that Dieng's physician had given his approval for Dieng to engage in light-duty work.

One month after these communications from his counsel, Dieng emailed Hunter asking for updates about possible light-duty positions. Dieng informed Hunter that Orkin's risk department never followed up with him after their previous email exchange. Hunter's response was terse, stating only that he was unaware of any light-duty positions.

Through discovery in this case, however, Dieng was able to identify two categories of light-duty positions at Orkin he contends he could have performed: customer service roles and sales representative roles. During his years of experience as a pest control technician, Dieng had become skilled at sales and customer relations and acquired deep knowledge of Orkin's customers, operations, and products. Dieng contends these skills and knowledge made him a suitable candidate for both categories of light-duty positions.

Orkin customer service workers provide administrative and customer support. They respond to customer calls, manage customer accounts, and record customer payments. In his deposition, Hunter acknowledged that Dieng would have been able to perform the tasks required for a customer service position and knew of no reason he was not suitable for such a role.

6

Orkin sales representatives solicit sales opportunities with prospective customers, inspect prospective customers' properties for pest control needs, and propose pest control treatment plans. While the job description for the sales representative position states that sales representatives are frequently required to carry up to twenty pounds and must occasionally carry up to sixty, the physical requirements for sales representatives vary. Dieng was knowledgeable about the requirements of the sales position and the duties of the position. He attested that he could have handled the amount of physical labor required for the sales position, which was less physically rigorous than his previous position as a pest control technician.

After Dieng asked to return to light-duty work and before he submitted his resignation, Orkin filled several vacant customer service and sales representative positions in the greater metropolitan region near the Orkin branch where Dieng was based. Yet no one from Orkin contacted Dieng about any of these vacancies.

On March 13, 2017, Dieng filed a charge with the Maryland Commission on Civil Rights (MCCR), which was cross-filed with the United States Equal Employment Opportunity Commission (EEOC). Dieng filed an amended charge on May 25, 2017. In both charges, Dieng alleges that Orkin discriminated against him by failing to provide a reasonable accommodation for his disability.

After filing these charges with the MCCR, Dieng remained on unpaid leave. In the summer of 2017, he settled his outstanding workers' compensation claims against Orkin. The settlement did not require Dieng to release claims beyond his workers' compensation claims.

7

All told, Dieng remained on leave for sixteen months before he submitted his resignation on June 7, 2017. Dieng contends that during this "time Orkin refused to provide [him] with a light duty accommodation, [he] had seven mouths to feed, and [his] family relied upon [his] employment to meet [their] basic needs and expenses." J.A. 850. Dieng stated unequivocally in his sworn declaration that he "would have taken any less physically onerous job that Orkin offered [him]." *Id.*

## II.    Procedural Background

Dieng filed this civil action in February 2021 in the United States District Court for the District of Maryland. Dieng amended his complaint in July 2021. The amended complaint contains two claims of disability discrimination under the ADA: that Orkin failed to accommodate his disability and that Orkin unlawfully terminated him because of his disability.

After the parties completed discovery, Orkin moved for summary judgment on both of Dieng's claims, pursuant to Federal Rule of Civil Procedure 56. The district court granted Orkin's motion in its entirety. *Dieng v. Orkin, LLC*, No. 21-cv-0482-LKG, 2025 WL 403794, at *11 (D. Md. Feb. 4, 2025). The district court concluded that Dieng's failure to accommodate claim could not succeed because the "unrebutted evidence show[ed] that [Dieng] could not perform the essential duties of his po[si]tion with a reasonable accommodation[.]" *Id.* at *7. The district court further found that Orkin reasonably accommodated Dieng's disability by placing him on indefinite unpaid leave. *Id.* at *9. As to Dieng's claim of unlawful termination, the district court found that Dieng voluntarily

8

resigned from his position and, therefore, his unlawful termination claim failed. *Id.* at *10. Dieng timely appealed.

## III. Analysis

We review a district court's grant of summary judgment *de novo*. *Wannamaker-Amos*, 126 F.4th at 254. Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Offs. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks omitted)).

The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees[.]" 42 U.S.C. § 12112(a). The ADA differs from other laws that prohibit workplace discrimination in that it creates an affirmative obligation on the part of employers. The term "discriminate," as it is used in the ADA, includes the failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee," absent undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A)). Thus, an employer must take proactive action in the form of workplace adjustments, known as "reasonable accommodations," to allow its employees to "obtain the *same* workplace opportunities that

9

those without disabilities automatically enjoy." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002).

When an employee seeks an accommodation for his disability, the employer is expected to take steps to determine whether an accommodation can reasonably be made. This process—which has come to be known as the "interactive process"—is the practical mechanism by which the promise of reasonable accommodation becomes a workplace reality. The interactive process "giv[es] employers and employees a chance to work together to figure out what accommodation, if any, would be reasonable and not unduly burdensome." *Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, 141 F.4th 568, 574 (4th Cir. 2025). At its core, the interactive process is a good-faith, collaborative dialogue between the employer and the employee aimed at identifying effective accommodations for an employee's known limitations—even if such limitations were not initially present at the outset of employment. Sometimes, these accommodations may include "the provision of qualified readers or interpreters;" sometimes, the accommodations may include "job restructuring, part-time or modified work schedules;" and sometimes, as in this case, the accommodations may include "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). The type of accommodation depends on the circumstances of each employee and employer.

This case requires us to consider whether it is consistent with the ADA for an employer to decline to reassign a disabled employee to an available position he would be able to perform, and instead to keep the employee on indefinite, unpaid leave. We hold that it is not.

10

A.  Failure to Accommodate

We first consider whether genuine issues of material fact remain as to whether Orkin failed to accommodate Dieng's disability. To make out a failure to accommodate claim, Dieng must show: 1) that he was disabled; 2) that Orkin was on notice of his disability; 3) that he was able to perform the essential functions of his position (or his desired position) with or without a reasonable accommodation; and 4) that Orkin failed to make such an accommodation. *See Tarquinio*, 141 F.4th at 573; *Wirtes v. City of Newport News*, 996 F.3d 234, 238–39 (4th Cir. 2021); *see also* 42 U.S.C. § 12111(8).

Dieng readily meets his burden on the first and second elements, as the parties agree. Dieng was disabled, and Orkin was on notice of his disability. The parties contest whether material facts remain in dispute regarding the third and fourth elements: whether Dieng was able to perform the essential functions of his desired position with a reasonable accommodation; and whether Orkin refused to provide such an accommodation. We address these two elements in turn.

*i. Essential Functions*

The district court concluded that summary judgment was appropriate because, even with reasonable accommodation, Dieng could no longer perform the essential functions of his former position as a pest control technician. *Dieng*, 2025 WL 403794, at *9. A position's "function is essential as long as it 'bears more than a marginal relationship to the job at issue.'" *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020) (quoting *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 279 (4th Cir. 2004)). The district

11

court did not consider whether Dieng could perform the essential functions of the light-duty positions he desired.

Where a disabled employee seeks an accommodation of reassignment, the employee must be able to show that he can perform the essential functions of the position he *desires*, not the essential functions of the job he holds. *See EEOC v. St. Joseph's Hosp. Inc.*, 842 F.3d 1333, 1344 (11th Cir. 2016). That Dieng could no longer perform all the duties of a pest control technician is, therefore, beside the point. We must examine whether Dieng produced evidence that he could perform the essential job functions of either the customer service or the sales representative position, the light-duty positions he requested. We hold that he did.

The record evidence supports the conclusion that Dieng could have performed the essential functions of customer service roles. Dieng's manager Blake Hunter testified in his deposition that he could think of no reason Dieng would not have been a suitable customer service representative. Notably, Orkin does not dispute this important fact.

As for the sales positions, there are genuine disputes of material fact as to whether Dieng could have performed the essential functions of these roles. Orkin points to the relevant job descriptions to argue that sales representatives are often called upon to carry out "heavy work," including frequent heavy lifting. Though job descriptions may be evidence of the essential functions of a position, *see* 42 U.S.C. § 12111(8), "[n]ot all job requirements or functions are essential." *Jacobs*, 780 F.3d at 579. In conducting the essential functions analysis, we must consider what the work actually entails, including the

12

amount of time individuals in the desired positions actually spend on purportedly essential tasks. *See id.* at 580.

The record evidence suggests that not all sales representative positions require the same level of physical exertion. Dieng submitted a sworn declaration, based on his personal knowledge of the sales role and his firsthand experience, stating that "[s]ales duties were far less physically rigorous and only occasionally required carrying heavy equipment, a difference and decrease in frequency that would have made the physical requirements more manageable for me." J.A. 845. He affirmed that he was "confident that [he] could have handled the amount of physical labor required for [a] sales position." *Id.* at 846. He further attested that "[a]t the point at which I was cleared for light duty, I could have performed the types of tasks that were required all day of the pest control technician on a much more occasional basis during the week as a salesperson." *Id.*

In addition to Dieng's sworn declaration, Hunter testified that, while some Orkin sales representatives were "expected to get up inside the attics [and] get into crawl spaces," others were primarily responsible for "building long-term relationships with clients." *Id.* at 322. This assessment was confirmed by the testimony of another Orkin employee who stated that the frequency with which a salesperson was expected to carry heavy equipment depended on the skill of the salesperson and "on the scope of the job." *Id.* at 730–31.

Viewing the evidence in the light most favorable to Dieng, as we must, we conclude that genuine issues of material fact remain regarding the essential functions of the desired positions and whether Dieng would have been able to perform them. Thus, Dieng met his

13

burden at summary judgment as to the third element of his ADA failure to accommodate claim.

In reaching a contrary result with regard to the sales role, our colleague ignores record evidence and improperly views the facts in the light most favorable to Orkin. Viewed properly, the record evidence shows that a genuine issue of material fact exists as to whether Dieng could have performed in this role. Our colleague rejects Dieng's sworn testimony as "self-serving opinion" and credits Orkin's testimony that the sales role required a level of physical exertion Dieng could not perform. Separate Op. at 24–25. Our colleague then concludes that Dieng's statements in his sworn declaration cannot create a genuine issue of material fact. *Id*. Our caselaw is clear, however, that "[s]elf-serving affidavits offered by the non-movant can be used as evidence to defeat summary judgment, . . . when they are based on personal knowledge or firsthand experience." *Jones v. Solomon*, 90 F.4th 198, 206–07 (4th Cir. 2024) (internal quotations marks and citations omitted). One would expect testimony submitted by a non-movant to oppose a motion for summary judgment to indeed be "self-serving." It can nevertheless be powerful evidence. So long as the testimony is, like the statements in Dieng's sworn affidavit, "based on personal knowledge or firsthand experience" it can create a dispute of material fact. *Id.* Of course, a jury will ultimately weigh this testimony, along with all other evidence adduced at trial, and assess what the essential functions of the desired positions are and whether

14

Dieng would have been able to perform them. *See Cowgill v. First Data Techs., Inc.,* 41 F.4th 370, 383 n.8 (4th Cir. 2022).[2] It is not this court's role to resolve factual disputes.

### *ii. Reasonable Accommodation*

On the fourth element, we must determine whether factual disputes remain as to whether Orkin failed to provide Dieng with a reasonable accommodation. As we have explained, a reasonable accommodation refers to changes in a workplace an employer may make to provide meaningful equal employment opportunity to a disabled employee. *See Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 416 (4th Cir. 2015).

The district court noted that, while Dieng sought an accommodation of reassignment to light-duty work, Orkin was not obliged to provide Dieng's *requested* accommodation. *Dieng*, 2025 WL 403794, at *9. The district court concluded that Orkin provided Dieng with a reasonable accommodation of his disability "by permitting him to take unpaid leave for several months." *Id.* We disagree. While keeping an employee on indefinite unpaid leave may be a reasonable accommodation under certain circumstances, it was not here.

An accommodation that an employer ultimately selects must be effective. *See Barnett*, 535 U.S. at 400. This effectiveness requirement is a crucial component of the reasonable accommodation analysis. *See Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015) ("The hallmark of a reasonable accommodation is effectiveness."). "An *ineffective* 'modification' or 'adjustment' will not

---

[2] Our colleague's positions regarding the relevant time period during which Orkin's obligation to accommodate Dieng applied, in addition to the appropriate geographic range for reassignment positions, are also factual disputes that must be presented to the jury.

15

*accommodate* a disabled individual's limitations." *Barnett*, 535 U.S. at 400. As such, a futile or ineffective accommodation is no accommodation at all.

Orkin maintains that it kept Dieng on indefinite unpaid leave up until his termination anticipating that Dieng would (and could) return to his prior position.[3] Such an "accommodation" would be ineffective and, therefore, not an accommodation at all. By placing Dieng on indefinite unpaid leave, Orkin maintained Dieng in professional purgatory—not yet terminated but not working either.

Ignoring the requirement that an accommodation be an effective one, Orkin argues that this court's decision in *Hannah v. United Parcel Service, Inc.*, supports the proposition that maintaining an employee on indefinite unpaid leave can be a reasonable accommodation. 72 F.4th 630, 636–37 (4th Cir. 2023). Orkin's reliance on *Hannah* is misplaced. In *Hannah*, a package delivery driver with hip and buttocks injuries requested a temporary accommodation, either in the form of driving a smaller truck or being placed in an indoor position. *Id.* at 633–34. Rather than providing either requested accommodation, the employer instead placed the driver on unpaid leave until he was able to recover from his injuries. *Id.* at 634. In affirming the district court's grant of summary judgment to the employer, this court held that under the circumstances placing the driver

---

[3] Orkin also maintains that it was reasonable to keep Dieng on indefinite unpaid leave because the parties were engaged in negotiations over Dieng's workers' compensation claims. This argument is unsupported by the ADA and the caselaw, and for good reason. While an employer and an employee may agree that the employee will take unpaid leave to avoid the uncomfortable dynamic of an employee going to work while engaging in negotiations to resolve a workplace dispute, such leave would need to be mutually agreed upon and would not otherwise absolve an employer from complying with the ADA.

16

on unpaid leave was a reasonable accommodation of his disability. *Id.* at 636–37. This was so because the driver's disability was temporary and the driver was expected to return to full-time employment in the same position. *Id.* at 637.

Neither is true here. The record is replete with evidence that Orkin was on notice that Dieng's disability was not temporary and that he was unable to return to his position as a pest control technician. To begin, Dieng submitted to Orkin documentation from his treating physician stating that he could return to work, but only to a position that was less physically demanding. Dieng notified Hunter that his "doctor said that [he could] only do light duty [ ] from now on." J.A. 920. Separately, Dieng's counsel reminded Orkin that Dieng was "eager to return to gainful employment" and requested that Orkin notify him when light-duty work became available. *Id.* at 41. Dieng once again emailed Hunter inquiring about the availability of light-duty positions.

On the element of the employer's failure to provide reasonable accommodation, we must also consider whether the employer engaged in good faith in the "interactive process" described in the ADA's implementing regulations. *Tarquinio*, 141 F.4th at 573 (citing 29 C.F.R. § 1630.2(o)(3)). Through this informal, collaborative process, an employer can understand the limitations caused by the employee's disability and can identify potential accommodations. The employer's duty to engage in the interactive process "is triggered when an employee communicates [his] disability and desire for an accommodation—even if the employee fails to identify a specific, reasonable accommodation." *Jacobs*, 780 F.3d at 581 (citing *Wilson v. Dollar Gen. Corp.*, 717 F.3d, 337, 346 (4th Cir. 2013)). "[A]n

17

employer who doesn't engage in good faith with the interactive process violates the ADA so long as a reasonable accommodation was possible." *Tarquinio*, 141 F.4th at 574.

Dieng provided evidence from which a reasonable jury could conclude that Orkin did not engage in the interactive process at all, let alone engaging in good faith. No one at Orkin made any attempt to speak with Dieng about his physical limitations or his request for light-duty work. Similarly, although Dieng provided Orkin updates from his physicians regarding his recovery, no one from the company made any effort to speak with Dieng's physicians regarding his disabling condition or his need for light-duty work. Moreover, there is no evidence indicating that anyone at Orkin ever responded to communications from Dieng's counsel requesting that his client be returned to work in a light-duty position. On this record, a reasonable jury could readily conclude that Orkin ignored Dieng's repeated requests to return to work in a light-duty position rather than engaging in the interactive process.

The record viewed in the light most favorable to Dieng also shows that a reasonable accommodation was possible. Dieng put forward evidence that light-duty positions came open at Orkin following his request for reassignment. While Orkin argues that Dieng could not perform the essential functions of several of the positions because they were located some distance away from Dieng's branch location in Gaithersburg, Maryland, Dieng never suggested that his disability required that he be reassigned to a location near his home. Nor did Orkin ask Dieng whether he had any such restrictions. Orkin also contends that some of the vacant positions paid less than Dieng's prior position as a pest control technician. Dieng, however, presented evidence that he would have been willing to accept a

18

lesser-paying role. Regardless, these are the types of issues that the interactive process is designed to address.

Finally, relying on *Elledge v. Lowe's Home Centers, LLC*, the district court reasoned that Orkin was under no obligation to reassign Dieng to a light-duty position because "reassignment is an accommodation of 'last resort.'" *Dieng*, 2025 WL 403794, at *6 (quoting *Elledge*, 979 F.3d at 1014). The district court's ruling misapprehends this court's holding in *Elledge*. To be sure, it is generally preferable for an employer to provide an accommodation that allows a disabled employee to remain in his current position. *Elledge*, 979 F.3d at 1014; *see also Wirtes*, 996 F.3d at 240–41. Where an employee can no longer remain in his current position because of disability, however, the ADA requires the employer to determine whether the employee can work in a different position without creating an undue burden for the employer. The parties do not dispute that Dieng was not able to perform the essential functions of his prior position because of his disability. Thus, the only question was whether Orkin was able to reassign Dieng to a different position without an undue burden.

Because we conclude that are genuine issues of material fact in dispute as to whether Orkin failed to accommodate Dieng's disability, summary judgment is not appropriate. Dieng is entitled to have a jury decide whether Orkin violated his right to a reasonable accommodation required by the ADA.

B.  Unlawful Termination on the Basis of Disability

We next turn to Dieng's claim that Orkin engaged in unlawful discrimination by terminating him because of his disability.

The district court granted summary judgment to Orkin on this claim, concluding that Orkin did not terminate Dieng, but rather that he resigned voluntarily as a condition of settlement of his workers' compensation claims. *Dieng*, 2025 WL 403794, at *10. In reaching this conclusion, the district court ignored the evidence supporting Dieng's contention that he had been constructively discharged, meaning that the workplace conditions forced him to resign. Dieng argues this was so because Orkin ignored his repeated requests to return to work in a light-duty position and instead kept him on indefinite unpaid leave. Certainly, keeping an employee on a lengthy and indefinite unpaid leave may support a claim of constructive discharge. *See White v. Honeywell, Inc.*, 141 F.3d 1270, 1279 (8th Cir. 1998) (holding that an employee who resigned after "suffer[ing] a forced unpaid medical leave of absence" may have been constructively discharged). We need not decide whether Dieng produced sufficient evidence to survive summary judgment on his unlawful termination claim, however, because we find that Dieng failed to exhaust his administrative remedies on this claim.

Prior to filing a civil suit under the ADA, a plaintiff must first file a timely charge with the Equal Employment Opportunity Commission (EEOC) or a similar state agency alleging disability discrimination or retaliation. *See* 42 U.S.C. §§ 12117(a); 42 U.S.C. § 2000e–5(e)(1), (f). A plaintiff's claims in his judicial complaint must be reasonably related to the claims alleged in his administrative charge or must be expected to follow

20

from a reasonable administrative investigation of the claims alleged in the charge. *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 384 (4th Cir. 2022); *see also Hollis v. Morgan State Univ.*, 153 F.4th 369, 380 (4th Cir. 2025).

Dieng's initial administrative charge filed with the Maryland Commission on Civil Rights (MCCR) alleges that Orkin discriminated against him by failing to accommodate his disability. The charge states that the discriminatory acts ended in December 2016, long before he resigned. Dieng then amended his charge weeks before he resigned. Neither Dieng's original charge nor his amended charge could thus allege unlawful termination. Because Dieng does not allege that he was terminated because of his disability nor does his unlawful termination claim fall within the scope of the administrative investigation that could have reasonably been expected to follow his failure to accommodate claim, Dieng's claim for unlawful discharge on the basis of disability was not administratively exhausted. The district court's grant of summary judgment to Orkin on this claim is therefore affirmed.

## IV.    Conclusion

For the reasons set forth above, we vacate the district court's grant of summary judgment to Orkin on Dieng's failure to accommodate claim and remand for further proceedings on that claim. The district court's grant of summary judgment on Dieng's claim of unlawful discharge on the basis of disability is affirmed.

*VACATED AND REMANDED IN PART*
*AND AFFIRMED IN PART*

21

QUATTLEBAUM, Circuit Judge, concurring in part, concurring in the judgment in part and dissenting in part:

I agree with the majority that Orkin, LLC was entitled to summary judgment on Ibrahima Dieng's wrongful termination claim. As to his failure-to-accommodate claim, I agree that the district court erred by granting Orkin summary judgment on the entire claim. But I disagree about the scope of the genuine disputes of material fact that remain.

The majority finds genuine disputes of material fact as to whether Orkin should have reassigned Dieng to two kinds of positions—sales and customer service. Maj. Op. at 11–15. As to the sales position, I think the district court was right that there is no genuine dispute of material fact suggesting Orkin should have given Dieng the position. As the majority points out, Dieng had to show that he could "perform the essential job functions" of the sales position. Maj. Op. at 12. To determine the essential functions of a job, we consider "the full range of evidence bearing on the employer's judgment," including the written job description and "the testimony of senior officials and those familiar with the daily requirements of the job." *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020). And because "the decision about a position's essential functions belongs, in the first instance, to the employer," its judgment merits "'considerable deference.'" *Id.* (quoting *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998)).

Orkin's job description for the sales position classifies the position as "heavy work," saying that a sales representative must lift up to 60 pounds, climb stairs and ladders and stand for half an hour at a time. J.A. 574. One Orkin manager testified that the sales position was a heavy-duty position with physical requirements similar to those of the pest control

22

technician position, which Dieng undisputedly could no longer perform. Another Orkin manager testified that salespeople had to "get up and down on their knees," "crawl[] around" and "carry stuff" and described the sales position as "basically the same job" as the pest control technician position. J.A. 486.

The majority says that Dieng established a genuine dispute of material fact on this point. They point out that he "submitted a sworn declaration, based on his personal knowledge of the sales role and his firsthand experience," claiming that the sales position was much less physically demanding than the customer service position and that he could have performed it after being released for light-duty work. Maj. Op. at 13. The majority is of course correct that we review evidence at summary judgment in the light most favorable to the nonmoving party—here, Dieng. *See Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022). And it's true that "self-serving affidavits offered by the non-movant can sometimes" create a genuine dispute of material fact. *Pfaller v. Amonette*, 55 F.4th 436, 450 (4th Cir. 2022).

But Dieng's declaration doesn't do that. Since Dieng's doctors gave him a light-duty restriction—and because Dieng requested to be reassigned to a light-duty role—the operative question isn't just whether Dieng thinks he was physically capable of doing the sales role. Rather, it's whether the sales role is a light-duty role. There's no genuine dispute on that question—it's not. Dieng acknowledges in his declaration that salespeople were "occasionally required [to] carry[] heavy equipment," J.A. 845, and sometimes had to do "some of the same weight-bearing, walking, standing, stooping, kneeling, and so-on" associated with the pest control technician role, J.A. 846. And these are precisely the kinds

23

of tasks Orkin could not ask Dieng to do consistent with his light-duty restriction. Dieng does not dispute that the doctor's note releasing him to light duty work prohibited lifting more than 20 pounds or engaging in "repetitive stooping, bending . . . or prolonged sitting or standing." J.A. 40. In light of that, Dieng's self-serving, after-the-fact opinion that Orkin should've reassigned him to a sales role despite his light-duty restriction does not create a genuine dispute of material fact. *See, e.g.*, *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 659 (4th Cir. 2020) ("[A] party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" (alteration in original) (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004))).

To the extent the majority finds that testimony from other Orkin employees established a genuine dispute of material fact, that's not right, either. The substance of the testimony the majority relies on is that salespeople "build[] long-term relationships with clients" in part by "getting up into ceilings, . . . doing inspections . . . [and doing] ladder work involved with" these tasks that the better a salesperson is, the more often he completes inspections and that the nature of each inspection depends on the size of the space to be inspected. J.A. 322–23. Accepting that testimony as true, it suggests that a sales position requires heavy-duty work. So, I respectfully dissent from the majority's decision to vacate the district court's order of summary judgment as to the sales position.

The customer service position is a tougher call. Unlike the sales position, it was a light-duty job. But even as to that position, a person seeking an accommodation has the onus to request it. *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 181 (4th Cir.

24

2024). Dieng informed Orkin that he was cleared for light-duty work on August 18, 2016. So, Orkin didn't have an obligation to place Dieng in a light-duty position before that date.

Also, on January 3, 2017, Dieng and Orkin agreed to a settlement in principle of Dieng's workers' compensation claims against Orkin. Orkin believed that the finalized settlement would include Dieng leaving Orkin. It believed this because Dieng's attorney represented to Orkin that Dieng would sign a general release. *See* J.A. 561 (email from Dieng's attorney to Orkin's attorney saying that Dieng was "scheduled to meet with [another of Dieng's attorneys] on April 4th to discuss and sign the Release"); J.A. 558–60 (Dieng's attorney discussing delays in getting the release signed). And, in Orkin's attorney's experience, it is "generally understood" that a general release "means that the claimant will leave the employer's employ." J.A. 551. To be sure, Dieng ultimately refused to sign the general release. But there is no genuine dispute over the fact that Orkin reasonably thought he would up until June 2017, when Dieng's attorney notified Orkin that Dieng now refused to sign. I see no factual or legal reason why Orkin should have considered Dieng for a customer service position when his lawyers were telling Orkin that Dieng was going to sign a general release under which he would leave the company. So, if there is a genuine dispute of material fact on the failure-to-accommodate claim, it is only as to the customer service position and only for positions available between August 18, 2016 and January 3, 2017.

On top of that, any duty Orkin had to consider Dieng for a customer service position only applied to the extent there were open positions in that timeframe. *See Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 961 (4th Cir. 2021) (noting that while the ADA

contemplates reassignment to a vacant position, it does not require that an employer create a new position for the employee seeking accommodation). And discovery uncovered no evidence of an opening for a customer service position in the Gaithersburg, Maryland branch where Dieng worked from August 18, 2016 to January 3, 2017. But in that time period, Orkin filled customer service positions in Lorton, Manassas and Ashburn, Virginia.

Does the fact that Orkin filled customer service jobs in a neighboring state create a genuine dispute of material fact as to whether there was a vacant position in which to place Dieng? We've never said an employer has to consider open positions in other branches. The majority says distance is immaterial because Dieng "never suggested that his disability required that he be reassigned to a location near his home." Maj. Op. at 18. But that answers a different question. The issue is not whether a longer commute was incompatible with Dieng's disability; it is whether an employer's reassignment duty reaches vacancies at distinct branches in another state. That said, the three Virginia branches were within an hour's drive of Dieng's Gaithersburg workplace. Also, Dieng requested a light-duty job, and an Orkin representative conceded that, if trained, Dieng could probably do the customer service job. And recall that Dieng was on unpaid leave, so the fact that the customer service position paid less than Dieng's old pest control technician job isn't dispositive. So, I cannot say as a matter of law that reassignment to one of those positions was unreasonable. As a result, I would remand the case, but only for consideration of Dieng's failure-to-accommodate claim concerning customer service positions in the Lorton, Manassas and Ashburn branches filled in November and December 2016.

26

But even on that narrow issue, the district court should consider on remand that, in our circuit, "reassignment is a disfavored accommodation that employers are generally under *no obligation* to offer." *Wirtes v. City of Newport News*, 996 F.3d 234, 241 (4th Cir. 2021). For example, Orkin was under no duty to reassign Dieng to another branch if doing so would disrupt a disability-neutral hiring or promotion system. *See Elledge*, 979 F.3d at 1016. Nor was Orkin required to offer Dieng a position if it would have conflicted with a branch's hiring or promotion plans. *See id.* at 1014 (explaining that reassignment is a disfavored remedy in part because it can upset "the employer's freedom to run its business in an economically viable way" and "the settled expectations of other employees"). In other words, a vacant position for which Dieng met the minimum qualifications does not, by itself, establish a reassignment duty.

Finally, aside from its analysis of the sales and customer service positions, the majority concludes that a reasonable jury could find that Orkin failed to engage in the interactive process with Dieng. Maj. Op. at 17–18. It is true that the ADA's regulations call for an interactive process, and our precedent confirms that obligation. *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013). But as Dieng acknowledges, "the interactive process is 'not an end in itself.'" Op. Br. at 24 (quoting *Wilson*, 717 F.3d at 347). And "[n]either the employer nor the employee can rest on a breakdown in the interactive process without connecting that breakdown to an element of failure-to-accommodate liability." *Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, 141 F.4th 568, 575 (4th Cir. 2025). So, in my view, whether Orkin engaged sufficiently in the interactive process isn't a basis for vacating the district court's order.

27

For these reasons, I concur in the majority's treatment of Dieng's wrongful termination claim. I also agree that a genuine dispute of material fact remains as to whether Orkin failed to accommodate Dieng by not reassigning him to one of the customer service positions filled in November and December 2016, though I think to the extent Orkin had such an obligation, it was narrow. But unlike the majority, I would affirm the district court's determination that Orkin had no obligation to reassign Dieng to a sales position.